UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA


STARNET INSURANCE COMPANY                          CIVIL ACTION

VERSUS                                             NO. 16-13511

LA MARINE SERVICE LLC AND                          SECTION "R" (3)
LEONARD JOURDAN, JR


**FINDINGS OF FACT AND CONCLUSIONS OF LAW**


I.    **INTRODUCTION**

This case arises out of the sinking of Defendant LA Marine Service LLC's vessel, the M/V CAPT. LJ.  Defendant Leonard Jourdan, Jr. is the owner and operator of LA Marine Service.[1]  Plaintiff StarNet Insurance Company supplied a time-hull insurance policy to defendants to cover the M/V CAPT. LJ for the policy period of September 24, 2015, through September 24, 2016.[2]  LA Marine Service and Leonard Jourdan are each listed as named assureds on the policy.[3]  The M/V CAPT. LJ sank on the night of April 7, 2016, or the early morning of April 8, 2016.[4]

---

[1]    R. Doc. 65 at 12.
[2]    *Id.*; Joint Ex. 1.
[3]    Joint Ex. 1 at 6.
[4]    R. Doc. 65 at 12.

On August 2, 2016, plaintiff filed suit requesting a declaratory judgment that it does not owe insurance coverage for losses arising out of the sinking of the M/V CAPT. LJ.[5] Defendants filed an answer, affirmative defenses, and a counterclaim for declaratory judgment and contractual and statutory damages.[6] On July 21, 2017, the Court struck defendants' jury demand because plaintiff designated its claim as an admiralty claim under Federal Rule of Civil Procedure 9(h).[7] The Court later granted plaintiff partial summary judgment and dismissed defendants' counterclaims for statutory penalties and lay up damages.[8]

The only unresolved claims are the parties' cross-claims for declaratory judgment on the issue of insurance coverage. After a pretrial conference on November 2, 2017, the parties agreed to try this case on a stipulated record and written submissions to the Court in lieu of a live trial.[9] The parties further agreed to waive hearsay and authenticity objections to expert reports and depositions.[10] The parties have submitted joint trial exhibits.[11] After reviewing the evidence, the Court rules as follows.

---

[5]   R. Doc. 1.
[6]   R. Doc. 13.
[7]   R. Doc. 60.
[8]   R. Doc. 62.
[9]   R. Doc. 66.
[10]  *Id.*
[11]  R. Doc. 67; R. Doc. 68-1.

## II.    FINDINGS OF FACT AND CONCLUSIONS OF LAW

### A. Legal Framework

It is undisputed that, at the time of its sinking, the M/V CAPT. LJ was insured by plaintiff.  But plaintiff argues that no insurance benefits are owed because the vessel sank as a result of defendants' negligence.[12]

### 1.  *Choice of Law*

As a threshold matter, the Court must determine whether state law or federal maritime law governs this dispute.  "A marine insurance contract is indisputably a marine contract within federal admiralty jurisdiction." *New Hampshire Ins. Co. v. Martech USA, Inc.*, 993 F.2d 1195, 1198 (5th Cir. 1993).  But "the interpretation of a contract of marine insurance is—in the absence of a specific and controlling federal rule—to be determined by reference to appropriate state law." *Albany Ins. Co. v. Anh Thi Kieu*, 927 F.2d 882, 886 (5th Cir. 1991) (internal quotation marks and citation omitted).  The Fifth Circuit has identified three factors a court must consider to determine whether to apply state law or federal maritime law: "(1) whether the federal maritime rule constitutes 'entrenched federal precedent'; (2) whether the state has a substantial, legitimate interest in application of its law; and (3) whether the state's rule is materially different from the federal

---

[12]     R. Doc. 68.

3

rule." *New Hampshire Ins. Co.*, 993 F.2d at 1198 (citing *Albany Ins. Co.*, 927 F.2d at 886).

The central issue in this case is whether defendants' negligence precludes coverage under the implied warranty of seaworthiness and/or the Liner Negligence Clause of the insurance contract. The parties assume that federal law governs this dispute. "Entrenched federal precedent exists on the implied warranty of seaworthiness and the interpretation of Inchmaree clauses in maritime insurance contracts, which displaces Louisiana law" with regard to the issue of seaworthiness. *Thanh Long Partnership v. Highland Ins. Co.*, 32 F.3d 189, 193-94 (5th Cir. 1994). The Liner Negligence Clause at issue here is closely related to the Inchmaree Clause and is similarly governed by Fifth Circuit precedent. Both clauses expand maritime insurance to cover additional perils, subject to the assured's due diligence. *See id.* at 191; *Employers Ins. of Wausau v. Occidental Petroleum Corp.*, 978 F.2d 1422, 1437-39 (5th Cir. 1992). The Court therefore applies federal maritime law to this dispute.

### 2. *Implied Warranties of Seaworthiness*

The Fifth Circuit has explained that "federal maritime law implies two warranties of seaworthiness in a time hull insurance policy": an absolute warranty of seaworthiness at the inception of the policy and "a modified,

negative warranty, under which the insured promises not to knowingly send a vessel to sea in an unseaworthy condition." *Employers Ins. of Wausau*, 978 F.2d at 1431-32. These implied warranties of seaworthiness are together known as the "American Rule." *See Sask. Gov't Ins. Office v. Spot Pack, Inc.*, 242 F.2d 385, 388 (5th Cir. 1957).

If a vessel owner, through bad faith or neglect, knowingly permits the "vessel to break ground in an unseaworthy condition," the insurer may deny coverage for "loss or damage caused proximately by such unseaworthiness." *Id.* at 388. The insurer bears the burden of proving unseaworthiness, and that such unseaworthiness was the cause of the loss. *Id.* at 389; *see also Tropical Marine Prods., Inc. v. Birmingham Fire Ins. Co. of Pa.*, 247 F.2d 116, 119 (5th Cir. 1957) (explaining that the vessel owner need not prove that the vessel was seaworthy).

### 3. *Liner Negligence Clause*

The insurance contract between the parties includes a Liner Negligence Clause, which covers losses caused by:

A. Breakdown of motor generators or other electrical machinery and electrical connections thereto; bursting of boilers; breakage of shafts; or any latent defect in the machinery or hull;

B. Loss of or damage to the subject matter insured directly caused by:
   1. Accidents on shipboard or elsewhere . . .
   2. Negligence, error of judgment or incompetence of any person;

> . . . *provided such loss or damage* (either as described in said "A" or "B" or both) *has not resulted from want of due diligence by the Assured(s), the Owner(s) or Manager (s) of the Vessel, or any of them.* **Master, mates, engineers, pilots or crew not to be considered as part owners within the meaning of this clause should they hold shares in the vessel.**[13]

A Liner Negligence Clause, like the related Inchmaree Clause, broadens the coverage available under a marine insurance policy beyond the "classic 'perils' clause" to cover losses caused by certain machinery or hull defects, or by the negligence of certain individuals. *See Employers Ins. of Wausau*, 978 F.2d at 1437-38 (citing 1 Alex Parks, *The Law and Practice of Marine Insurance and Average*, 363-406 (1987)).

The Liner Negligence Clause appears to form the sole possible basis for defendants' claim for insurance proceeds. Plaintiff's complaint and defendants' counterclaim both state that the M/V CAPT. LJ sank because water entered the engine room through the shafts, stuffing boxes, and packing gland assemblies.[14] Defendants assert that the damage to the M/V CAPT. LJ resulted from a premature failure of the stuffing box.[15] As explained in more detail below, a stuffing box or packing gland assembly consists of a chamber filled with packing rings that create a seal around the

---

[13]   Joint Ex. 1 at 18-19 (emphasis added).
[14]   R. Doc. 1 at 3; R. Doc. 13 at 9.
[15]   R. Doc. 13 at 10.

vessel's propulsion shaft, permitting the shaft to rotate while preventing almost all leaks into the engine room.[16]  Plaintiff represents that a sinking caused by defects in, or breakdown of, the shafts and stuffing boxes is not covered by the insurance policy unless defendants satisfy the requirements of the Liner Negligence Clause.[17]

As the insured party, defendants bear the initial burden of proving that their loss falls within the policy's coverage.  *See New Hampshire Ins. Co.*, 993 F.2d at 1200.  The insurer then bears the burden of proving the applicability of any policy exclusions.[18]  *Id.*  Defendants' briefing fails to specify which clause of the insurance contract covers the sinking of the M/V CAPT. LJ.  But defendants' claims representative, Nicholas Cozad, asserted in a letter to plaintiff on behalf of defendants that the vessel's sinking "was the result of an unforeseen and sudden failure/accident which is a covered peril under the Liner Negligence Clause of this contract."[19]  Because

---

[16]     Joint Ex. 9 at 18-19; Joint Ex. 20 at 13.  In their response to plaintiff's interrogatories, defendants explain that the vessel's external propeller is attached to its motor through a shaft, which passes through a stuffing box. Defendants further state that "[a] sound stuffing box installation is critical to safety because failure can admit a catastrophic volume of water into the vessel." *See* Joint Ex. 20 at 13.

[17]     R. Doc. 68 at 7.

[18]     Although the Court applies federal maritime law, the parties' respective burdens of proof are the same under Louisiana insurance law. *See Tunstall v. Stierwald*, 809 So. 2d 916, 921 (La. 2002).

[19]     Joint Ex. 8 at 3.

defendants have not pointed to any other provision in the insurance contract that covers their loss, the Court finds that defendants' claim for insurance benefits is governed by the Liner Negligence Clause.

Defendants argue that the Liner Negligence Clause's exclusion for losses that result from "want of due diligence by the Assured(s), the Owner(s) or Manager (s) of the Vessel" should not apply to preclude coverage because the Liner Negligence Clause is intended to "broaden and not restrict, to expand, not withdraw, coverage" (quoting *Spot Pack*, 242 F.2d at 391).[20] A Liner Negligence Clause does permit recovery for some losses that would not be available under traditional maritime insurance contracts, such as losses caused by the negligence of the vessel's builder and construction supervisor. *See Employers Ins. of Wasau*, 978 F.2d at 1440. But the clause's expansion of coverage is not unlimited. As is clear from the explicit terms of the policy, "to come within the protection of the Liner Negligence Clause, the loss in this case must not have resulted from a want of due diligence" by the assured, owner, or manager of the vessel. *Id.* at 1439; *see also Spot Pack*, 242 F.2d at 392 (noting that the proviso in the Inchmaree Clause excluding coverage for loss or damage caused by want of due diligence "refers only to acts of which the owner had privity and knowledge").

---

[20]     R. Doc. 67 at 5.

Thus, under the terms of the insurance policy, plaintiff does not owe insurance benefits if it can establish that the sinking of the M/V CAPT. LJ resulted from the lack of due diligence of Leonard Jourdan as the assured party and vessel owner. Plaintiff argues that the American Rule and the Liner Negligence Clause constitute independent defenses to coverage, and that a violation of either results in a denial of insurance benefits.[21] But the Fifth Circuit has found that a Liner Negligence Clause or Inchmaree Clause can waive or displace the American Rule's implied warranties of seaworthiness.[22] *See Employers Ins. of Wasau*, 978 F.2d at 1440; *Tropical Marine Prods., Inc.*, 247 F.2d at 122-23; *Spot Pack*, 242 F.2d at 392. Thus, the Court examines whether plaintiff properly denied coverage under the Liner Negligence Clause.

## B. Cause of Sinking

The M/V CAPT. LJ was moored to a spud barge in the Quality Pipeline yard in Empire, Louisiana, when it sank during the night of April 7, 2016, or

---

[21]    R. Doc. 68 at 4.

[22]    In its order granting partial summary judgment, the Court found that the American Rule and the Liner Negligence Clause together provided plaintiff with reasonable grounds to believe that it could defend against defendants' insurance claim. *See* R. Doc. 62 at 9-11. The summary judgment briefs did not address, and the Court did not rule on, whether the Liner Negligence Clause and the American Rule employ the same negligence standard.

the early morning of April 8, 2016.[23]  Two marine surveyors, Austin Glass and Nicholas Paternostro, issued reports related to the sinking.  Glass, Paternostro, and Jourdan also testified as to the condition of the M/V CAPT. LJ and the maintenance of its stuffing boxes.

### 1.  *Glass Report*

Austin Glass of Rivers & Gulf Marine Surveyors conducted a preliminary inspection and survey of the vessel, and issued a preliminary advice report on April 10, 2016.[24]  Glass has worked as a marine surveyor for Rivers & Gulf since 2011, and was previously with the U.S. Coast Guard for six years.[25]  Glass's report stated that the vessel's "stuffing boxes were believed to be leaking, but an automatic bilge pump was used to keep the water pumped out of the vessel.  To do this the generator was left running at all times."[26]  The report further noted that "[i]t is believed that at some point during the night the generator engine stopped running and the engine room started to fill with water as the bilge pump did not have any power to it," causing the vessel to sink.[27]

---

[23]  R. Doc. 65 at 12.
[24]  *Id.*; Joint Ex. 2.
[25]  Joint Ex. 14 at 3-4.
[26]  Joint Ex. 2 at 1.
[27]  *Id.* at 2.

Glass later testified that he did not inspect the stuffing boxes himself, and instead based his report on his conversation with Jourdan and their discussion of what might have caused the sinking.[28]  He noted that the only scenario that he and Jourdan "could come up with was there was a failure in the stuffing boxes."[29]  Glass further testified that he discussed with Jourdan a slight leak of the stuffing boxes, but "that is the industry standard for those types of stuffing boxes."[30]  Glass noted that stuffing boxes are designed to leak for cooling purposes.[31]  Further, Glass testified that he did not know whether and to what extent the stuffing boxes were leaking.[32]  Nor did he know whether the generator was running at the time of the sinking.[33]  Glass explained that he was not asked to determine the cause of the sinking of the M/V CAPT. LJ, and he did not determine the cause.[34]

### 2. *Paternostro Report*

On June 23, 2016, Nicholas Paternostro conducted a survey of the M/V CAPT. LJ at plaintiff's request.[35]  Paternostro has worked as a marine

---

[28]    Joint Ex. 32 at 21-22, 47.
[29]    *Id.* at 22.
[30]    *Id.* at 24.
[31]    Joint Ex. 14 at 11.
[32]    *Id.* at 10.
[33]    Joint Ex. 32 at 13.
[34]    *Id.* at 12.
[35]    R. Doc. 68 at 11; Joint Ex. 9.

surveyor with the firm Dufour, Laskay & Strouse since 2006, and he estimates that he has completed several hundred surveys during that time period.[36] Paternostro was previously employed as a machinery technician for the U.S. Coast Guard between 1997 and 2006.[37] Paternostro's survey of the M/V CAPT. LJ concluded that "the most probable cause of the vessel's sinking was the result of uncontrolled seawater ingress into the vessel's engine room through the packing gland assemblies."[38] The packing gland assemblies, also known as stuffing boxes, consist of a chamber where packing rings are compressed around the vessel's propulsion shafts, creating a seal that eliminates almost all water.[39] According to Jourdan, the packing in the M/V CAPT. LJ consisted of a graphite type material.[40]

Paternostro's report explained that the packing rings in the stuffing boxes should "establish a compression seal around the shaft which is required to maintain watertight integrity in the engine room and at the same time allow for sufficient cooling of the main propulsion shafts."[41] Paternostro found that the M/V CAPT. LJ's port and starboard propulsion

---

[36] Joint Ex. 28 at 6, 10.
[37] *Id.* at 8.
[38] Joint Ex. 9 at 23.
[39] *Id.* at 18.
[40] Joint Ex. 29 at 45.
[41] Joint Ex. 9 at 19.

shafts were heavily worn, resulting in an hourglass appearance.[42]  The port propulsion shaft was worn down from an original shaft diameter of 3 inches to a diameter of 1.75 inches, and the starboard propulsion shaft was worn down from an original shaft diameter of 3 inches to a diameter of 2.25 inches.[43]  Photographs attached to Paternostro's report show significant wear at one point in the length of each shaft, giving the shafts an hourglass appearance.[44]

Paternostro concluded that the shafts were worn down because of a lack of maintenance.[45]  His report noted that, over time, packing rings will wear down, and worn or old packing can become hard.[46]  Paternostro opined that the packing rings in the M/V CAPT. LJ's packing gland assemblies "were subjected to compression failure due to old packing rings not being removed when new packing rings were installed in the packing chamber."[47]  Paternostro further explained that this practice of "jamming packing material up against the main propulsion shaft journals stimulated shaft wear resulting from a combination of frictional heat and abrasive contaminates

---

[42]    *Id.* at 18.
[43]    *Id.*
[44]    *Id.* at 62-64.
[45]    *Id.* at 23.
[46]    *Id.* at 19.
[47]    *Id.* at 23.

over time."[48]   Heavily worn shafts can in turn "present a poor sealing condition between the shaft and the packing chamber."[49]   Based on these observations, Paternostro's report concluded that the condition of the packing gland assemblies provided an opportunity for an uncontrollable volume of seawater to enter the engine room.[50]   Paternostro later testified that, "if you have an improper seal or excessive amount of water entering an engine room, that is a non-seaworthy condition."[51]

### 3. *Defendants' Account*

Jourdan testified as to his maintenance practices with regard to the packing gland assemblies.  Jourdan stated that he would add packing rings to the stuffing box as needed, such as when he observed excess leaking.[52]   He testified that, when he added new packing, he did not remove the old packing unless it was hanging out or easily accessible.[53]   Jourdan further stated that he did not know what happened to the old packing, and was "not sure if it wears and goes away or . . . goes out the other end.  I have no idea."[54]

---

[48]      *Id.*
[49]      *Id.*
[50]      *Id.* at 23-24.
[51]      Joint Ex. 28 at 63.
[52]      *Id.* at 41-42.
[53]      *Id.* at 48-49.
[54]      *Id.* at 49.

In their counterclaim, defendants state that "the M/V CAPT. LJ sank because water infiltrated the engine room by way of the shafts, stuffing boxes, and packing gland assemblies, flooding the engine room and bilge."[55] Defendants further assert that the vessel was damaged "when it suddenly and unexpectedly began to take on water due to a premature failure of the stuffing box while moored in Empire, LA."[56] But defendants do not contest that they lack physical evidence to support the theory that the sinking was caused by a sudden and unexpected failure of the stuffing boxes.[57]

### 4. *Conclusions*

Plaintiff contends that the M/ V CAPT. LJ sank because of Jourdan's improper maintenance of the vessel's stuffing boxes.[58] Defendants do not offer an alternative theory of the cause of the sinking of the M/V CAPT. LJ. Instead, defendants appear to argue that Paternostro's report is unreliable because he was hired to confirm plaintiff's preexisting theory of how the vessel sank, and plaintiff allegedly directed him to focus on the vessel's shafts and packing assemblies.[59] But defendants offer no specific facts to contest

---

[55] R. Doc. 13 at 9.
[56] *Id.* at 10.
[57] R. Doc. 36-2 at 3; Joint Ex. 29 at 82-83.
[58] R. Doc. 68.
[59] R. Doc. 67 at 10-11.

Paternostro's detailed findings regarding the deteriorated condition of the M/V CAPT. LJ's propulsion shafts and stuffing boxes.

The Court finds that Paternostro's report is credible, and that plaintiff has proven that the M/V CAPT. LJ sank because of a leak through the vessel's stuffing boxes. Further, the Court finds by a preponderance of the evidence that this leak was caused by overstuffing of packing material against the propulsion shafts, which wore down the shafts and led to a failure of the compression seal around the shafts.

## C. Due Diligence

The sole question remaining is whether the leak from the stuffing boxes resulted from want of due diligence by Jourdan as the assured party and vessel owner. With regard to a vessel's seaworthiness, "[w]here the standard of due diligence is applicable, it comprehends inspection and investigation, where prudent, to determine the existence of deficiencies before they become critical." *Ionion S.S. Co. of Athens v. United Distillers of Am., Inc.*, 236 F.2d 78, 84 (5th Cir. 1956); *see also* Black's Law Dictionary (1oth ed. 2014) (Due diligence is the diligence, or attention and care, "reasonably expected from, and ordinarily exercised by, a person who seeks to satisfy a legal requirement or to discharge an obligation.").

Due diligence is judged by an objective standard rather than the vessel owner's subjective beliefs regarding acceptable practices. *See Deutsche Shell Tanker Gesellschaft mbH v. Placid Refining Co.*, 993 F.2d 466, 473 n.29 (5th Cir. 1993). Objectively inadequate maintenance constitutes a lack of due diligence. *See Steel Coils, Inc. v. M/V LAKE MARION*, 331 F.3d 422, 430-31 (5th Cir. 2003) (affirming district court judgment that defendant vessel interests failed to exercise due diligence because the ship's hatches were insufficiently maintained and had not been properly tested for watertightness before embarkation); *Deutsche Shell Tanker*, 993 F.2d at 472-73 (affirming district court finding that vessel owner failed to exercise due diligence in maintaining radar unit because owner did not follow the manufacturer's recommendations).

It is essentially uncontested that Jourdan failed to maintain the vessel's stuffing boxes and propulsion shafts properly. In response to plaintiff's interrogatories regarding maintenance of the stuffing boxes, defendants stated that the "maintenance performed generally included opening the stuffing boxes, inserting additional packing rings/glands and/or tightening the stuffing boxes. No written procedures or policies exist."[60] Jourdan himself testified that he added new packing material to the stuffing boxes

---

[60] Joint Ex. 20 at 5.

without removing the old packing, and that he "ha[d] no idea" what happened to the old packing material.[61]

Paternostro testified that Jourdan's practice of adding new packing rings without removing old packing material constituted poor maintenance.[62] He explained that "[y]ou can't just keep jamming packing in" because it "pushes up against the shaft, the rotating shaft. What happens over time is it loses lubrication, efficiency. You build up heat. The packing gets hard . . . that's an abrasive, and it scores the shaft."[63] Paternostro noted that the packing rings on the M/V CAPT. LJ "were basically welded to the inner diameter of the packing chamber. They hadn't been touched in, it looked like, a long period of time."[64]

Andrew Minster, the owner of Rivers & Gulf Marine Surveyors and a marine surveyor with about 40 years of experience, also testified regarding the maintenance of the stuffing boxes on the M/V CAPT. LJ.[65] Minster stated that the maintenance "might not have been proper maintenance, great maintenance. But some maintenance had been done" because new packing

---

[61]     Joint Ex. 29 at 48-49.
[62]     Joint Ex. 28 at 35-36.
[63]     *Id.* at 36-37.
[64]     *Id.* at 33.
[65]     Joint Ex. 33 at 6.

material was added.[66]   But Minster agreed that continuously packing material into the stuffing boxes can lead to further wear of the shaft and additional leaking.[67]

Defendants assert that Paternostro gave conflicting testimony with regard to whether packing rings should have been removed, and they contend that it would have been reckless and unreasonable to attempt to replace the packing rings while the M/V CAPT. LJ was afloat.[68]   But defendants mischaracterize Paternostro's testimony.  Paternostro explained that taking out too many packing rings at once could present a risk of flooding, but he did not suggest that it was never safe to remove and replace packing rings.[69]   He instead stated that "[y]ou would only take out about three packing rings," and "if you're adding three rings of packing, you should take out three rings of packing."[70]   Paternostro's testimony indicates that it would have been safe to remove and replace small amounts of packing material while the M/V CAPT. LJ was moored, and defendants offer no explanation why Jourdan failed to do this.

---

[66]   *Id.* at 12.
[67]   *Id.* at 13.
[68]   R. Doc. 67 at 6-7.
[69]   Joint Ex. 28 at 34.
[70]   *Id.* at 34, 36.

Further, the evidence indicates that Jourdan was aware of leaks from the stuffing boxes that exceeded acceptable levels. Based on the condition of the shafts and packing gland assemblies, Paternostro formed the impression that it was likely "that both packing gland assemblies were leaking seawater at a rate that should have provoked the necessity of an inspection and/or repairs."[71] Paternostro testified that, per most commercial industry standards, a leak should not exceed a pencil lead-sized stream of water, "[n]ot the pencil itself, just the lead."[72] Jourdan testified that the stuffing boxes had a small drip every five to ten seconds when the vessel was not running, but that the stream of water out of the stuffing boxes would be about as thick as a number 2 pencil when the vessel was running hard.[73]

Contrary to defendants' representations, Paternostro did not state that an excessive leak is a subjective term dependent on the opinion of the person inspecting the packing glands.[74] Paternostro instead explained that there can be "variable opinions, but it goes back to our industry standards or, you know, we said earlier a pencil lead stream . . . . If you can't control it, that should provoke an inspection."[75] Glass testified that, according to industry

---

[71]     Joint Ex. 9 at 23.
[72]     Joint Ex. 28 at 40-41.
[73]     Joint Ex. 29 at 88-89.
[74]     R. Doc. 67 at 4.
[75]     Joint Ex. 28 at 66.

standards, a vessel working in shallow water like the M/V CAPT. LJ should have had a light to moderate drip of water from the stuffing boxes, which would consist of droplets but not a steady stream.[76] Neither Paternostro nor Glass suggested that a pencil-sized stream of water was acceptable.

Based on this evidence, the Court finds that Jourdan failed to exercise due diligence to maintain the M/V CAPT. LJ's stuffing boxes. At a minimum, a vessel owner would reasonably be expected to ascertain what happens to the packing material already in a stuffing box before adding more packing rings. Jourdan's practice of continuously adding packing rings to the stuffing boxes without removing old material damaged the propulsion shafts and stuffing boxes, undermined the watertight seal, and permitted seawater to flood the vessel. Additionally, the evidence indicates that Jourdan was aware of an excessive leak from the stuffing boxes and failed to take reasonable steps to ensure that the stuffing boxes were in seaworthy condition.

Although defendants argue that they "employed maintenance activities that were within acceptable tolerances of generally accepted industry standards," they provide no factual support for this assertion.[77] On the contrary, in arguing that plaintiff lacks evidence of bad faith under the

---

[76] R. Doc. 32 at 24-26.
[77] R. Doc. 67 at 11.

American Rule, defendants themselves state that "the proof shows nothing more than negligence on the part of defendants to use simple means to make the vessel seaworthy."[78]  The Court finds that plaintiff has demonstrated that the loss of the M/V CAPT. LJ resulted from the want of due diligence of Leonard Jourdan as the assured and vessel owner.  The vessel's sinking is therefore excluded from coverage under the Liner Negligence Clause.[79]

## III.  CONCLUSION

For the foregoing reasons, the Court directs judgment to be entered declaring that StarNet Insurance Company does not owe insurance coverage in connection with the sinking of the M/V CAPT. LJ, on or about April 7, 2016.  Defendants' counterclaim for declaratory judgment is DISMISSED.

New Orleans, Louisiana, this __27th__ day of December, 2017.


_____
SARAH S. VANCE
UNITED STATES DISTRICT JUDGE

---

[78]     *Id.* at 9.

[79]     Plaintiff has also shown that Jourdan breached the implied warranty of seaworthiness under the American Rule because he, through neglect, knowingly permitted the M/V CAPT. LJ to break ground in an unseaworthy condition.  *See Spot Pack*, 242 F.2d at 389.  The unseaworthy condition of the stuffing boxes proximately caused the vessel's sinking.